**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| SNMP RESEARCH, INC. and SNMP RESEARCH INTERNATIONAL, INC., | § § § | |
| Plaintiffs, | § § § | |
| v. | § § § | C.A. No. 1:13-cv-00204-RGA |
| AVAYA INC., | § § | **Jury Demand** |
| Defendant. | § § § § | |

**FIRST AMENDED COMPLAINT FOR COPYRIGHT**
**INFRINGEMENT, BREACH OF CONTRACT, AND**
**MISAPPROPRIATION OF TRADE SECRETS**

COME NOW, Plaintiffs, SNMP Research, Inc. ("SNMPR") and SNMP Research International, Inc. ("SNMPRI") (collectively, "Plaintiffs"), by and through counsel, and hereby bring this amended complaint for copyright infringement, breach of contract, and misappropriation of trade secrets against Defendant Avaya Inc. (hereinafter "Avaya" or "Defendant").

**PARTIES**

1.  Plaintiff SNMP Research, Inc. ("SNMPR") is a Tennessee corporation with its principal place of business in Knoxville, Tennessee.

2.  Plaintiff SNMP Research International, Inc. ("SNMPRI") is a Tennessee corporation with its principal place of business in Knoxville, Tennessee.

3.  Defendant Avaya Inc. is a Delaware corporation with its principal place of business in Basking Ridge, New Jersey.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over the copyright causes of action pursuant to 28 U.S.C. §§ 1331 and 1338. This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

5.      Personal jurisdiction exists over Defendant Avaya because it is a Delaware corporation residing in this District.

6.      Venue is potentially proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) because Defendant is a Delaware corporation and is subject to personal jurisdiction in this District. However, Plaintiffs dispute this is the proper forum to decide this matter as Plaintiffs originally filed their Complaint in the Eastern District of Tennessee, and it was transferred to this Court upon motion by Avaya because Action No. 12-191 RGA-SRF was filed before this action was filed in the Eastern District of Tennessee. Plaintiffs aver that this matter should be transferred back to the Eastern District of Tennessee.

## FACTUAL BACKGROUND

7.      In 1988, University of Tennessee computer science professor Dr. Jeffrey Case and one of Dr. Case's graduate students founded the company that would later become Plaintiff SNMP Research, Inc. Based in Knoxville, Tennessee, Dr. Case was instrumental in developing technology that manages devices used in computer networks (such as the Internet).

8.      One of the foundational technologies of modern computer networks is the Simple Network Management Protocol ("SNMP"), from which the Plaintiffs take their name. Dr. Case was instrumental in creating this protocol. The SNMP protocol is a way for connected devices to share information by sending and responding to messages. For example, a laser printer may communicate with a connected computer using SNMP to pass messages regarding the printer's

{D0004052}

status (*e.g.*, offline, needs paper, busy, etc.).

9.   Since its creation in the early 1990s, with the help of Dr. Case, the SNMP protocol has become ubiquitous and the vast majority of managed computing devices in the world implement the protocol.

10.   Plaintiffs are the owners of sixteen (16) registered copyrights (the "Copyrights") as listed below:

| Company | Product | Registration Date | Registration Number |
| --- | --- | --- | --- |
| SNMP Research, Inc. | NETMON, Associated Applications, and Libraries Version 15 | January 25, 2011 | TXu 1-706-718 |
| SNMP Research, Inc. | NETMON, Associated Applications, and Libraries Version 15.2 | July 20, 2011 | TXu 1-772-248 |
| SNMP Research, Inc. | NETMON, Associated Applications, and Libraries Version 15.3 | July 20, 2011 | TXu 1-772-250 |
| SNMP Research, Inc. | NETMON, Associated Applications, and Libraries Version 15.4 | February 3, 2011 | TXu 1-738-956 |
| SNMP Research, Inc. | NETMON, Associated Applications, and Libraries Version 16 | February 3, 2011 | TXu 1-707-158 |
| SNMP Research, Inc. | NETMON, Associated Applications, and Libraries Version 16.2 | February 3, 2011 | TXu 1-738-954 |
| SNMP Research, Inc. | NETMON, Associated Applications, and Libraries Version 17 | February 3, 2011 | TXu 1-707-157 |
| SNMP Research, Inc. | NETMON, Associated Applications, and Libraries Version 17.2 | February 3, 2011 | TXu 1-738-958 |
| SNMP Research International, Inc. | SNMP Research Collection: Source Code and Documentation Version 15 | February 17, 2011 | TXu 1-710-420 |
| SNMP Research International, Inc. | SNMP Research Collection: Source Code and Documentation Version 15.2 | February 17, 2011 | TXu 1-710-462 |

| SNMP Research International, Inc. | SNMP Research Collection: Source Code and Documentation Version 15.3 | February 17, 2011 | TXu 1-710-430 |
|---|---|---|---|
| SNMP Research International, Inc. | SNMP Research Collection: Source Code and Documentation Version 15.4 | February 17, 2011 | TXu 1-710-425 |
| SNMP Research International, Inc. | SNMP Research Collection: Source Code and Documentation Version 16 | February 17, 2011 | TXu 1-710-413 |
| SNMP Research International, Inc. | SNMP Research Collection: Source Code and Documentation Version 16.2 | February 8, 2011 | TXu 1-710-422 |
| SNMP Research International, Inc. | SNMP Research Collection: Source Code and Documentation Version 17 | February 8, 2011 | TXu 1-710-417 |
| SNMP Research International, Inc. | SNMP Research Collection: Source Code and Documentation Version 17.2 | February 17, 2011 | TXu 1-710-435 |

11.     Copies of each of the registration certificates are attached as Exhibits 1-16.

12.     Plaintiffs SNMPR and SNMPRI own an implementation of the SNMP protocol represented by the Copyrights, including all source code, associated documentation, and Derivative Works thereof (collectively, "Software"). With respect to this Complaint, "Derivative Works" means (i) any program or documentation in source code form or binary form which (A) is developed by Avaya through the use of the Software, or (B) includes any features, provisions, algorithms, or other portions of the Software, or (ii) derivative works as defined in 17 U.S.C. § 101 et seq. (the "Copyright Act").

13.     While SNMPR owns the copyrights to individual code files, SNMPRI owns copyrights to collections and/or compilations of those files. Thus, a single piece of software may

infringe upon the copyrights to the individual files as well as the copyright to the collective works or compilations.

14.     In addition to being copyrightable, portions of this valuable Software constitute the confidential trade secrets of Plaintiffs.  The trade secrets include, but are not limited to, the Derivative Works that result from the incorporation of the Software originally provided to Avaya with Avaya's software and software created through use of the tools provided with the Software, and Derivative Works thereof.

15.     SNMPR and SNMPRI have expended substantial time, labor, and money to research and develop its trade secrets which Avaya is wrongfully exploiting.

16.     The trade secrets are neither available to nor known by the general public or Plaintiffs' competitors.

17.     Plaintiffs have taken substantial measures and exercised significant due diligence in preventing their trade secrets from being available to persons other than those selected by Plaintiffs.  Plaintiffs impose significant restrictions in SNMPRI's standard license agreement, including the Red License, as defined below, on the number of persons who have access to the trade secrets.  The persons and parties who receive such trade secret information are obligated under SNMPRI's standard license agreement to keep that information confidential.

18.     Plaintiffs require all trade secrets, and copies thereof, be returned upon its employees' termination, whether voluntary or involuntary.

19.     When SNMPRI licenses the Software to third parties, SNMPRI's standard license agreement, including the Red License, requires that the trade secrets be kept secret.

20.     These secrecy provisions extend beyond the life of the licenses to ensure Plaintiffs' trade secret information is kept secure.

{D0004052}

21.     Further, these licenses require third parties to return or destroy all trade secret information at the end of the licenses' terms.

22.     SNMPRI's licensees are required to distribute the Software to licensees' end users in a form that is not readable by humans to protect the secrecy of the Software.

23.     SNMPRI's standard licenses, including the Red License, require that third parties who include these trade secrets in their products include a license provision that prevents their customers from reverse engineering or decompiling the trade secret.

24.     Plaintiffs derive a significant competitive advantage over their competitors from the trade secrets not being generally known.

25.     SNMPRI has licensed the Software to many of the largest computer and telecommunications companies in the world and it is widely used in the industry.  Those firms then use the Software within their own products or to operate their own networks.

26.     On March 14, 1995, SNMPRI executed a license with AT&T GBCS (hereinafter the "AT&T License").  The AT&T License allowed AT&T GBCS to include portions of SNMPRI's Software within certain products in exchange, *inter alia*, for royalty payments.

27.     By its terms, the AT&T License is governed by Tennessee law.

28.     By its terms, the AT&T License may not be modified except by a writing signed by both parties.

29.     While SNMPRI's licenses, by their terms, are not transferrable, SNMPRI, by written agreement dated September 28, 2000, allowed portions of the AT&T License to be assigned to Avaya.

30.     The AT&T License with Amendment 1 dated December 29, 1995, Amendment 2 dated May 5, 1996, Amendment 3 dated May 14, 1996, Amendment 4 dated July 28, 1996,

Amendment 5 dated October 21, 1996, Amendment 7 dated October 21, 1996, Amendment 8 dated October 10, 1996, Amendment 12 dated November 15, 1997, Amendment 13 dated October 31, 1997, Amendment 14 dated March 23, 1998 , Amendment 19 dated March 13, 1998, Amendment 21 dated April 15, 1998, and Amendment 57 dated August 14, 2000 (collectively, "Transferred License") were transferred to Avaya.

31.     After the transfer to Avaya, the Transferred License was further modified by Amendment 62 dated December 28, 2000, Amendment 63 dated March 26, 2002, Amendment 64 dated March 26, 2002, Amendment 65 dated March 26, 2002, Amendment 66 dated January 27, 2003, Amendment 67 dated September 16, 2003 and letters dated April 2, 2002, May 8, 2002, February 14, 2003, and March 21, 2003, (as amended and assigned, collectively, the "Red License").

32.     Pursuant to the Red License, Avaya was only licensed to use the Software in the products specified in the Red License.

33.     In general, and in the case of the Red License, SNMPRI grants licenses that are limited to use in specific products, not to all of a company's offerings. Therefore, if Avaya wants to use the Software on a new product outside the scope of the existing license, a new license or written modification is required.

34.     In general, and in the case of the Red License, SNMPRI's limited licenses are personal in nature and are not transferrable absent a written agreement.

35.     Under the terms of the Red License, Avaya had access to portions of the Software.

36.     The Red License specifically states the Software is "clearly marked as confidential and/or proprietary" and "ha[s] been developed by SNMP[RI] [with] great

expenditures of time, resources, and money."

37.     In entering the Red License, Avaya agreed it "shall exercise the same degree of care to safeguard the confidentiality of the Program Source and the Sources of any Derivatives Work as it exercises to protect its own source code of a similar nature, but in no case less than a reasonable degree of care."

38.     The Red License also required Avaya to "take appropriate action with its employees and consultants, by agreement or otherwise, to satisfy its obligation under [the Red License] with respect to use, copying, transference, protection, and security of the Program Source, and any other materials provided to [Avaya] by SNMP[RI] as a result of" the Red License.

39.     Avaya was provided access to the Software so that it might include the Software in specific products as allowed by the Red License.  One of Avaya's obligations under the Red License was to pay royalties to SNMPRI in a timely manner for the allowed distribution of the Software.

40.     In Avaya's April 21, 2009, royalty report for the first calendar quarter of 2009, Avaya represented to SNMPRI that Avaya had distributed 957 Avaya products containing Software licensed under the Red License during the preceding period.  This number far exceeded products identified in prior Avaya reports.

41.     Avaya's report did not contain sufficient information for SNMPRI to identify which amendment under the Red License the 957 Avaya products should be associated with.

42.     On April 22, 2009, SNMPRI contacted Avaya in order to seek clarity regarding the 957 unknown Avaya products.  Throughout the summer of 2009, SNMPRI repeatedly attempted to follow up with Avaya in order to achieve clarity.  Avaya did not provide clarity

until October, 2009.

43.     In October 2009, Avaya provided documents to SNMPRI representing that the 957 unknown Avaya products previously reported in Avaya's April 21, 2009 royalty report were Avaya's Communication Manager product.   Avaya further represented that the 957 Avaya products were licensed under Amendment 57 of the Red License.   Avaya's representations and assurances in this regard appeared to resolve the issues regarding the content of Avaya's April 21, 2009 royalty report.

44.     Plaintiffs reasonably relied on Avaya's representations and assurances identified in paragraph 43 above.   These representations, if true, entitled Avaya to a volume discount. Further, these representations and assurances assured Plaintiffs that Avaya was operating within the scope of the Red License.   SNMPRI had no reason to suspect at this time that Avaya was engaged in wholesale, willful infringement of the Software.   It was only later that Plaintiffs came to understand these representations were false.

45.     Specifically, in November and December, 2009, John Southwood and Mary Gibson from SNMPRI had a series of conference calls with Barry Marcus and others of Avaya. These conversations revealed that Avaya's previous representations and assurances were false, as Avaya was: (1)   distributing its Communication Manager product outside the scope of the Amendments to the Red License by distributing it unbundled from the licensed Bundled Product configuration in an unbundled software only configuration; and (2)  reporting the number of keys that had been generated to unlock the software to enable it rather than the number of copies that contained, all, some, or part of the Software licensed under the Red License as was required by the Red License.

46.     Avaya did not have a license to ship Communication Manager as an unbundled

{D0004052}

9

software-only configuration.

47.     During these calls, Avaya admitted that its prior representations and assurances were false, and that it had in fact used Plaintiffs' copyrights and trade secret information in products for which it did not have a license. This was the first time that Plaintiffs discovered, or reasonably could have discovered, that Avaya engaged in wholesale copyright infringement of Plaintiffs' copyrights.

48.     Avaya also admitted during these calls that it had significantly underpaid SNMPRI by failing to report distribution of thousands upon thousands of products which contained Plaintiffs' Software.

49.     On November 1, 2011, SNMPRI informed Avaya of breaches of the Red License by letter in accordance with ¶ 18(b) of the Red License.  Pursuant to the terms of the Red License, Avaya had 45 days to cure those breaches.

50.     Avaya did not cure the breaches within the prescribed forty-five (45) day window, and, thus, SNMPRI had the right to terminate Avaya's license rights under the Red License.

51.     In fact, during the 90 plus days following the notice of breach, Avaya failed to pay royalties under the terms of the Red License in clear breach of its obligations.

52.     On February 1, 2012, SNMPRI informed Avaya that Avaya's license rights under the Red License were terminated pursuant to ¶ 18(b) of the Red License.

53.     Despite the termination of Avaya's license rights under the Red License, Avaya has continued to exploit the copyrighted and trade secret Software by manufacturing and selling products containing the Software.

54.     Further, upon information and belief, Avaya has continued to use, copy, distribute and otherwise exploit the copyrighted and trade secret Software in products for which it never

had a license.

55.     Paragraph 19 of the Red License provides that all expenses, including attorneys' fees, are to be awarded to the prevailing party in any legal action related to the Red License.

56.     Further, Avaya has been unlawfully distributing Plaintiffs' Software through product lines it acquired through its acquisition of Spectel, Inc.

57.     In 2002, Spectel, Inc. entered a licensing agreement with SNMPRI ("2002 Agreement"). Under the terms of the 2002 Agreement, Spectel, Inc. had access to Plaintiffs' Software and limited permission to exploit that Software.

58.     The 2002 Agreement was personal in nature and non-transferable absent a written agreement.

59.     In 2004, Avaya purchased Spectel, Inc. Following this purchase, Avaya continued to exploit the Software covered by the 2002 Agreement between SNMPRI and Spectel, Inc.

60.     Avaya never entered into any agreement with Plaintiffs to have the right to use the Software covered by the 2002 Agreement. Instead, Avaya simply took Plaintiffs' copyrighted and trade secret Software and distributed that Software without permission.

61.     SNMPRI attempted to negotiate the transfer of the 2002 Agreement, putting Avaya on notice that it was operating without permission. Despite SNMPRI's efforts to negotiate the transfer of the 2002 Agreement, Avaya never entered into any agreement, but instead infringed on Plaintiffs' copyrights and misappropriated Plaintiffs' trade secrets.

{D0004052}

## CAUSES OF ACTION

## CLAIM I

### Copyright Infringement – Unlicensed Products

62.     Plaintiffs reallege and incorporate herein the allegations contained within paragraph 1 through paragraph 61.

63.     Plaintiffs are the owners of the sixteen (16) registered Copyrights listed above.

64.     Avaya has been distributing the copyrighted Software in products it has manufactured and sold even though Avaya does not now have, and has never had, a license to include the copyrighted Software in these products.

65.     Avaya manufactures and sells a Communication Manager product.

66.     The Red License authorizes Avaya to use and distribute the Software with Communications Manager running on a Hewlett-Packard ProLiant DL380 Generation 2 Server running 32-bit Red Hat Linux on the 80x86 CPU, with the Avaya G600 Media Gateway.

67.     Upon information and belief, Communications Manager is not distributed by Avaya on a Hewlett-Packard ProLiant DL380 Generation 2 Server running 32-bit Red Hat Linux on the 80x86 CPU, with the Avaya G600 Media Gateway.

68.     Therefore, Avaya does not now have, nor has it ever had, a license to distribute the Software with the current version of Communications Manager.

69.     Avaya is distributing the Software with its Communications Manager product.

70.     On information and belief, Avaya has been distributing other unlicensed products that infringe one or more of the Copyrights.

71.     On information and belief, Avaya has also been distributing the software through product lines it purchased through its acquisition of Spectel, Inc. without authorization or

{D0004052}

permission to distribute the Software.

72.     Avaya's conduct infringes on Plaintiffs' copyrighted Software because these exploitations have been undertaken without authorization, permission, or consent. Further, these acts violate Plaintiffs' exclusive rights under the Copyright Act.

73.     Avaya's acts of infringement are willful, intentional, and purposeful.

74.     Each of Avaya's infringements of Plaintiffs' rights constitute a separate and distinct act of infringement, separately actionable under the Copyright Act.

75.     Unless enjoined and restrained, Defendant's continued conduct threatens to further infringe Plaintiffs' copyright interests.

76.     By reason of Defendant's infringement and threatened continuing infringement, Plaintiffs have sustained, and will continue to sustain, substantial injury, loss, and damages to their ownership rights in the Software.

77.     Further, irreparable harm to Plaintiffs is imminent as a result of Defendant's continuing infringement, and Plaintiffs are without an adequate remedy at law. Plaintiffs are entitled to a permanent injunction restraining Defendant, its officers, directors, agents, employees, representatives, and all persons acting in concert with them, from engaging in further such acts of copyright infringement.

78.     These infringements related to the Red License, and the use of the Software in products beyond those licensed under the Red License, were only discovered, and reasonably able to be discovered, within three years of the filing of this action. Indeed, the discovery was made by Plaintiffs only after Avaya ultimately admitted its wrongdoing to Plaintiffs, and Plaintiffs therefore learned that Avaya's prior assurances that it was operating within the confines of the Red License were false. Therefore, Plaintiffs are further entitled to recover from

Defendant the damages sustained by Plaintiffs as a result of Defendant's acts of copyright infringement dating back to the inception of the infringement. Plaintiffs are at present unable to ascertain the full extent of the monetary damages they have suffered by reason of Defendant's acts of copyright infringement. However, Plaintiffs are entitled to recover their actual damages, including Avaya's profits from infringement, as will be proven at trial.

## CLAIM II

### Copyright Infringement – Red License Products

79.     Plaintiffs reallege and incorporate herein the allegations contained within paragraph 1 through paragraph 78.

80.     Plaintiffs are the owners of sixteen (16) registered Copyrights listed above.

81.     On information and belief, since at least the termination of Avaya's license rights under the Red License on February 1, 2012, Avaya has been making or is having made, and distributing or having distributed, unauthorized copies and derivatives of the Software in conjunction with the products that were licensed under the Red License prior to February 1, 2012.

82.     This post-termination exploitation is copyright infringement because it has been undertaken without authorization, permission, or consent and violates Plaintiffs' exclusive rights under the Copyright Act.

83.     Unless enjoined and restrained, Defendant's continued conduct threatens to further infringe Plaintiffs' copyright interests.

84.     Avaya's acts of infringement are willful, intentional, and purposeful.

85.     Each of Avaya's infringements of Plaintiffs' rights constitute a separate and distinct act of infringement, separately actionable under the Copyright Act.

86.     By reason of Defendant's infringement and threatened continuing infringement, Plaintiffs have sustained, and will continue to sustain, substantial injury, loss, and damages to their ownership rights in the Software.

87.     Further, irreparable harm to Plaintiffs is imminent as a result of Defendant's conduct, and Plaintiffs are without an adequate remedy at law. Plaintiffs are entitled to a permanent injunction restraining Defendant, its officers, directors, agents, employees, representatives, and all persons acting in concert with them from engaging in further such acts of copyright infringement.

88.     Plaintiffs are further entitled to recover from Defendant the damages sustained by Plaintiffs as a result of Defendant's acts of copyright infringement. Plaintiffs are at present unable to ascertain the full extent of the monetary damages they have suffered by reason of Defendant's acts of copyright infringement. However, Plaintiffs are entitled to recover their actual damages, including Avaya's profits from infringement, as will be proven at trial.

## CLAIM III

### Breach of Contract – Red License

89.     Plaintiffs reallege and incorporate herein the allegations contained in paragraphs 1 through 88.

90.     SNMPRI and Avaya have a valid and binding contract, the Red License.

91.     SNMPRI performed its material obligations under the terms of the Red License.

### Non-Payment and Non-Reporting

92.     Paragraph 28 of the Red License required Avaya to pay, on a quarterly basis, a per-copy royalty for each binary copy produced and distributed which contains all, some, or part of the Software as specified in the Red License.

93.     Upon information and belief, from at least 2002 through the present, Avaya has not accurately reported the number of Avaya products sold which included the Software.

94.     Further, upon information and belief, from at least 2002 through February 1, 2012, to the extent a product was licensed, Avaya did not fully pay the per-copy royalties required in the Red License.

95.     Avaya eschewed its obligation by purposefully underreporting units sold and by seeking discounts to which it was not entitled.

96.     Paragraph 31 of the Red License required Avaya to provide SNMPRI with annual reports, prepared by a certified public accountant, verifying the accuracy of royalties paid by Avaya when requested by SNMPRI.  On November 1, 2011, SNMPRI requested annual reports from Avaya for the years 2008, 2009, 2010 and 2011.

97.     Avaya has not provided annual reports for the years 2008 through 2011.

98.     By reason of the foregoing and other acts not presently known by SNMPRI, Avaya has knowingly and materially breached its contractual obligations to SNMPRI under the Red License.

99.     According to the terms of the Red License, the prevailing party to any action arising from the Red License is entitled to recover its actual and reasonable attorneys' fees and costs.  Further, under the terms of the Red License, SNMPRI is entitled to monthly interest for Avaya's failure to correctly pay SNMPRI.

100.     Avaya's material breach of the Red License is the legal cause of substantial damage to SNMPRI for which SNMPRI seeks monetary damages in an amount to be determined at the time of trial.

101.     Further, SNMPRI seeks attorneys' fees and costs under the terms of the Red

License.

## Source Code Destruction Provisions

102.    Avaya's material breach of the Red License allowed SNMPRI to terminate Avaya's license rights with forty-five (45) days' notice.

103.    At SNMPRI's election, Paragraph 18(b)(i) required Avaya to return or provide written notification of the destruction of all copies or derivatives of the "Program Source" (except for one archive and support copy) at the request of SNMPRI.

104.    On November 1, 2011, SNMPRI provided Avaya with written notice of breach.

105.    Avaya did not cure the breach within forty-five (45) days.

106.    On February 1, 2012, SNMPRI invoked the provisions of Paragraph 18(b)(i) and demanded written certification of destruction of the "Program Source" and all derivative works except for one copy to be used only for archival and support purposes.

107.    Avaya has not provided the required return or written certification of destruction of the Software.

108.    Avaya's action in this regard is a material breach of the Red License and is the legal cause of substantial damage to SNMPRI for which SNMPRI seeks monetary damages in an amount to be determined at the time of trial.

109.    Additionally, SNMPRI seeks specific performance under the Red License and an order that Avaya must certify its destruction of the "Program Source" and all derivative works.

## CLAIM IV

### Misappropriation of Trade Secrets

110.    Plaintiffs reallege and incorporate herein the allegations contained within paragraph 1 through paragraph 109.

111.     As discussed fully above in paragraphs 14 through 24, Plaintiffs have multiple trade secrets, including the Derivative Works wrongly used, distributed, misappropriated, exploited and distributed by Avaya.  The trade secrets derive significant independent economic value from not being publicly known and from not being generally known in Plaintiffs' trade or business.  The trade secret information cannot be readily ascertained or derived from publicly available information, and Plaintiffs take reasonable efforts to maintain the confidentiality and secrecy of their trade secrets.

112.     On information and belief, Avaya has misappropriated Plaintiffs' trade secrets by improper means, including utilization of the trade secrets in products not identified in the Red License.

113.     On information and belief, Avaya has misappropriated Plaintiffs' trade secrets by continuing to utilize the trade secrets in its products after the termination of the Red License on February 1, 2012.

114.     Avaya had access to and knowledge of this valuable trade secret information under the terms of the Red License.

115.     Avaya knew the trade secrets were secret and the Red License specifically obligated Avaya to keep this information secret.

116.     Avaya has misused these trade secrets to further its own business to the detriment of Plaintiffs.

117.     Plaintiffs have suffered damages as a result of Avaya's misappropriation of trade secrets.

118.     Upon information and belief, Avaya's misappropriation and use of Plaintiffs' trade secrets was willful and malicious.

119.     This Court may enjoin the actual or threatened misappropriation of trade secrets as well as award money damages.

120.     By reason of Defendant's misappropriation of Plaintiffs' trade secrets and its threatened continuing misappropriation, Plaintiffs have sustained, and will continue to sustain, substantial injury, loss, and damages to their rights in the protected information.

121.     Further, irreparable harm to Plaintiffs is imminent as a result of Defendant's conduct, and Plaintiffs are without an adequate remedy at law since the damages Plaintiffs suffered are incapable of exact proof.

122.     Avaya will continue to use and misappropriate Plaintiffs' trade secrets and cause irreparable harm unless Avaya is permanently enjoined from such conduct.

123.     Plaintiffs are entitled to a permanent injunction restraining Defendant, its officers, directors, agents, employees, representatives, and all persons acting in concert with them, from continuing to misappropriate Plaintiffs' protected trade secrets.

124.     Plaintiffs are entitled to have any misappropriated trade secret returned to their sole control.

125.     Avaya's actions in this regard, directly and proximately, caused and are continuing to cause, Plaintiffs significant harm, for which Plaintiffs are entitled to damages in an amount to be determined at trial.

126.     Plaintiffs are entitled to exemplary damages.

127.     Plaintiffs are entitled to reasonable attorneys' fees.

## **PRAYER FOR RELIEF**

WHEREFORE, PLAINTIFFS PRAY FOR THE FOLLOWING RELIEF:

1.      For a judgment that Avaya has infringed, and continues to infringe, upon Plaintiffs' copyrights in the registered Software;

2.      For a judgment that Avaya has misappropriated Plaintiffs' trade secrets;

3.      For actual and compensatory damages from Defendant in an amount to be determined at trial, including pre-judgment and post-judgment interest, and interest as required under the terms of the Red License;

4.      For an award of damages for Avaya's willful copyright infringement.

5.      For an award of exemplary damages for Avaya's misappropriation of Plaintiffs' trade secrets.

6.      Equitable relief including a permanent injunction enjoining Avaya, its officers, agents, servants, employees, all parent and subsidiary companies, all assignees and successors in interest, and those persons in active concert or participation with Avaya, including Avaya's customers, from manufacturing, reproducing, distributing, adapting, displaying, advertising, promoting, offering for sale, and/or selling or performing any materials that are substantially similar to the Software, and to deliver to the Court for destruction or other reasonable disposition all such materials and means for producing the same in Avaya's possession, custody, or control;

7.      An order that Avaya destroy the Software;

8.      For an award of reasonable attorneys' fees, costs, and expenses;

9.      For such further and other relief that this Court deems just and proper; and

10.     For a trial by jury.

{D0004052}

Dated: September 12, 2013

/s/ Edward J. Kosmowski
Edward J. Kosmowski (No. 3849)
Karen M. Grivner (No. 4372)
Clark Hill Thorp Reed
824 N. Market Street, Suite 710
Wilmington, DE  19801
Telephone:  (302) 250-4750
Facsimile:   (302) 421-9439
Email: kgrivner@clarkhill.com

Richard S. Busch, Esquire
KING & BALLOW
315 Union Street
Suite 1100
Nashville, Tennessee 37201
Telephone: (615) 726-5422
Facsimile: (888) 688-0482
Email: rbusch@kingballow.com

John L. Wood, Esquire
EGERTON, MCAFEE, ARMISTEAD &
DAVIS, P.C.
900 S. Gay Street
Knoxville, Tennessee 37902
Telephone:  (865) 546-0500
Facsimile: (865) 525-5293
Email: JWood@emlaw.com

*Attorneys for Plaintiffs SNMP Research, Inc. and
SNMP Research International, Inc.*

{D0004052}